**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION**

| | | |
|---|---|---|
| KERRY ANN LOOMIS, individually and on behalf of others similarly situated, | ) ) ) | |
| | ) | Civil Action No. 1:20-cv-251 |
| Plaintiff, | ) ) | |
| | ) | Honorable Curtis L. Collier |
| v. | ) | Magistrate Christopher H. Steger |
| | ) | |
| UNUM GROUP CORPORATION, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION
FOR STEP-ONE NOTICE PURSUANT TO THE
FAIR LABOR STANDARDS ACT**

## I.    INTRODUCTION

Rather than working within the well-established conditional certification framework utilized by courts in this District and Circuit, Defendant opposes notice to misclassified salaried Disability Benefits Specialists ("Benefits Specialists")[1] by asking the Court to not only consider, but to rule on, the merits of Plaintiff's claims, to give weight to Defendant's competing evidence, to resolve factual disputes in Defendant's favor, and to ignore both the lenient conditional certification standard and the substantial case law supporting conditional certification of collective actions involving claims examination employees.

Setting aside Defendant's efforts to complicate and obscure, this is a straightforward misclassification case that asks whether Benefits Specialists—regardless of their specific job title—are entitled to overtime pay. The only question properly before the Court is whether Plaintiff has met the

---

[1] Plaintiff previously utilized the abbreviation DBSE, which is consistent with Defendants' previous designation of the position, but will use "Benefits Specialist" for purposes of this Reply, as that is the term used in Defendant's Response.

**lenient** standard to show that she was similarly situated to the other Benefit Specialists to whom she seeks to send notice. Plaintiff's evidence—eight declarations, job descriptions for the positions at issue, and an abundance of documentary evidence—satisfies the minimal showing required at this stage. She and other Benefit Specialists (1) performed similar job duties and (2) were subjected to the same practice of receiving a salary without overtime compensation as required by the Fair Labor Standards Act ("FLSA"). The Court should grant Plaintiff's Motion.

## II.    THE PROPOSED CLASS

The class definition should be amended to clarify the scope of the class and the admissions made by Defendant in its Response:

> All salaried Disability Benefits Specialists ("Benefits Specialists") who worked for Unum at any time since [insert date three years prior]. Benefits Specialists include STD Benefits Specialist, LTD Benefits Specialist, and IDI Benefits Specialists regardless of level (i.e., "Core", "Senior", or "Lead") and any other employee, however titled, whose job duties included processing disability claims using the guidelines in Unum's Benefit Center Claims Manual ("Collective Action Members").

The slight modification to the class definition is reflected in the proposed Notice attached as Exhibit A, which now identifies the specific job titles that Defendant used for individuals who processed disability claims in its Response. *See* ECF 84, at 1, 4, 7; Exhibit A. The modification also clarifies that Plaintiff does not seek to send notice to individuals employed as "LTC Benefits Specialists," described in Section I.B. of Defendant's Response. LTC Benefits Specialists' job duties involve processing long-term-care claims, not disability claims.

## III.   PLAINTIFFS HAVE MET THEIR LENIENT FIRST STAGE BURDEN

Because merits arguments and contradictory evidence dominate Defendant's Response, Plaintiff reminds the Court that the bar for conditional certification is purposefully low, and Plaintiff has easily met her burden. "At this stage, the plaintiff must show only that [her] position is similar, **not identical**, to the positions held by putative class members." *Penarouque v. Century Park Assocs., LLC*, No. 1:18-cv-122, 2019 WL 11271273, at *1 (E.D. Ten. Jan. 31, 2019) (quoting *Comer v. Wal-Mart*

*Stores, Inc.*, 454 F.3d 544 (6th Cir. 2009)) (internal quotation marks omitted). Plaintiff need only make a "modest factual showing," *Comer*, 454 F.3d at 547, to "establish[] at least a colorable basis for [her] claim that a class of similarly situated plaintiffs exist," *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004).

Plaintiff has unquestionably met her burden. Plaintiff's Motion is supported by sworn statements of eight Benefits Specialists from across the country,[2] and substantial documentary evidence—including job descriptions for the at-issue positions, and corporate admissions—all demonstrating that:

- All Benefits Specialists share the same primary duty: utilizing the guidelines contained in Defendant's Benefits Center Claims Manual ("Claims Manual") to approve disability claims that meet specific, predetermined criteria ("Claims Examination Work"). *See* ECF 1, ¶¶ 4-8; ECF 53, Siegel Decl., Exs. A-H, ¶¶ 4, 7-9; *id.*, Grp. Ex. K, at 23, 29, 48, 54, 64; *id.*, Ex. N, at 25-27.

- If a claim meets established criteria, Benefits Specialists approve the claim and send a template approval letter, using a formula set forth in the Claims Manual to calculate the amount due on the claim. *Id.*, Exs. A-K, ¶ 4.

- If a claim does not meet established criteria, Benefits Specialists send a proposed template denial letter to a supervisor to make the determination of whether the claim should be denied. *Id.; see also id.* ¶ 8 (quoting Ex. J at 143:18-24 (former Unum Claims Director and Assistant Vice President admitting in deposition that Benefits Specialists could not make the decision to deny benefits without director approval)).

- Benefits Specialists perform their job duties in accordance with policies, procedures, and guidelines in Defendant's Claims Manual and cannot deviate from these decision-making tools in performing their job duties. *Id.*, Exs. A-H, ¶ 7; *see also id.* ¶ 8 (citing Ex. J at 4, 10, 35-37).

- While Benefits Specialists can deny a claim based on a claimant's failure to meet deadlines to provide necessary documentation, they have no authority to deny a claim for failure to meet coverage criteria. Defendant had a strict policy requiring Benefits Specialists to send claims that did not meet established criteria to management for a determination on denial. *Id.*, Exs. A-K, ¶ 7, 8; *see also id.* ¶ 8 (citing Ex. J at 143:18-24 (former Unum Claims Director

---

[2] Defendant attempts to discount declarations from California Benefits Specialists, but the evidence before the Court demonstrates that all Benefits Specialists are similarly situated, and Defendant has failed to articulate any substantive reason why their testimony should be discounted.

and Assistant Vice President admitting in deposition that Benefits Specialists could not make the decision to deny benefits without director approval)).

- Defendant closely tracks Benefits Specialists' Claims Examination Work and regularly reviews their claim files to determine whether they have complied with the company's procedures and guidelines. Failure to meet the company's production or accuracy requirements in applying these procedures and guidelines would have resulted in poor performance reviews, corrective action, and potential termination. *Id.*, Exs. A-H, ¶¶ 8-10.

- Benefits Specialists regularly work over 40 hours per week without receiving pay for their regular overtime work. Instead of paying Benefits Specialists overtime for their overtime work, Defendant pays them under its misclassification policy that classified Benefits Specialists as exempt from the FSLA, pays them a salary, and denies them overtime for their regular overtime work. *Id.*, Exs. A-H, ¶ 12.

Notably, Defendant's Response fails to deny that all salaried Benefit Specialists: (1) were classified as exempt; (2) share the same primary job duty of processing disability claims in accordance with predetermined guidelines; (3) use guidelines to process claims contained in Defendant's Claims Manual; and (4) lack the authority to deny disability insurance claims. Instead of addressing these salient points that establish Plaintiff and all salaried Benefits Specialists are similarly situated, Defendant's Response does not even mention the Claims Manual or whether Benefits Specialists have the authority to deny claims. Plaintiff's unrebutted evidence accordingly shows that this Court should grant conditional certification.

## IV. THE COURT SHOULD REJECT DEFENDANT'S ARGUMENTS IN THEIR ENTIRETY.

### A. Defendant's Response Relies Almost Exclusively on Premature Merits Arguments and Irrelevant Evidence

As the Court aptly noted in its recent Order denying pre-certification discovery, "a district court does not generally consider the merits of claims, resolve factual disputes, or evaluate credibility in considering conditional certification." ECF 83, at 10 (citing *Russell v. Grubb & Assocs., Inc.*, No. 3:18-CV-463, 2019 WL 5872476, at *6 (E.D. Tenn. Aug. 15, 2019)). The Court made clear that "[e]ven if Defendant presented evidence that [Plaintiff's] declarations' factual assertions were false, such evidence would not be considered." *Id.* at 10-11.

Notwithstanding the Court's statement of these well-established principles, the majority of Defendant's Response is comprised of either: (1) merits arguments regarding the applicability of the administrative exemption; or (2) attempts to contradict Plaintiffs' substantial evidence with competing declarations. Because these arguments are not appropriate at this stage of the litigation, the Court need not (and should not) consider them in rendering its decision on conditional certification. If the Court determines that some of Defendant's argument warrant consideration, however, Plaintiff addresses each of them in this Reply.

**B. Although Plaintiffs Will Establish Unum's FLSA Violations at Trial, the Court Should Decline to Rule on the Merits at This Time**

Defendant dedicates a significant portion of its Response to the argument that Benefits Specialists are claims adjusters, are not production workers, and are therefore exempt administrators. ECF 84, at 14-18. Although Defendant acknowledges that this argument relates solely to the merits, it claims that this Court should consider the merits now because Plaintiff's claims fail as a matter of law. *Id.* at 17 (insisting that Plaintiff's claims are "doomed to fail"). Defendant argues that Benefits Specialists are exempt because they are similar to a group of claims adjusters found to be exempt administrators in a U.S. Department of Labor ("DOL") regulation, 29 C.F.R. § 541.203(a). The Benefits Specialists here, however, do not perform the same job duties as the exemplar insurance claims adjusters described in § 541.203(a). *Id.* (providing that the job duties of the exemplar insurance claims adjusters to be "interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation").[3] These job duties are not the job duties of

---

[3] Defendant incorrectly relies on the inapposite case *Foster v. Nationwide Mutual Insurance Co.*, 710 F.3d 640 (6th Cir. 2013), to suggest that any individual who performs claims review services is an

Benefits Specialists who (1) conduct telephone interviews to collect a predetermined set of information to process disability claims; (2) do not make recommendations regarding litigation; (3) lack any authority to negotiate claims; (4) lack any authority to determine the amount Unum pays on claims; (4) lack any authority to deny claims; (5) do not prepare damage estimates; and (5) process all disability claims consistent with criteria and guidelines contained in Defendant's Claims Manual. *See* ECF 53, Siegel Decl., Exs. A-H ¶ 6.

Notably, in an opinion letter issued less than six months after the effective date of § 541.203(a), the DOL's Wage and Hour Division determined that certain insurance claims adjusters were **not** administratively exempt, emphasizing that §541.203(a) "simply provides an illustration of the application of the administrative duties test" and "does not provide a blanket exemption for claims adjusters." WH Admin. Op. FLSA2005-2, 2005 WL 330610 (Jan. 7, 2005). This letter found that "junior-level claims adjusters" should be classified as nonexempt because their work involves "routine, recurrent, and repetitive tasks"—such as conducting telephone interviews with a list of prepared questions to assess the validity of workers' compensation claims—and does not involve the significant exercise of discretion and independent judgment. *Id.* Similarly, the DOL also opined in another letter authored the same year that claims examiners who were not assigned complex or difficult claims involving litigation, whose settlement authority was only $5,000, and who were consistently required to obtain supervisor approval on most tasks did not exercise sufficient discretion and independent judgment to meet the administrative exemption. WH Admin. Op. FLSA2005-26, 2005 WL 3308596

---

exempt claims adjuster. As exemplified by the abundance of case law cited below, Plaintiff has much more in common with the (1) Junior Level Claims Adjusters and claims adjusters who were consistently required to obtain supervisor approval on tasks described in the below referenced opinion letters than the (2) investigators in *Foster* who generally had "prior background in law enforcement or insurance claims" and were hired to investigate a small subset of claims that included indicators of fraud. *Id.* at 642. That is, the types of claims they were investigating, which only comprised 1% of all claims, *id.*, were those that necessarily demanded far more scrutiny and critical thought.

(Aug. 26, 2005).  Here, Plaintiff more closely resemble the above-referenced telephone junior claims adjusters than the full-fledged, field-based claims adjusters described in § 541.203(a).

Although Defendant will be unable to meet its burden to establish its administrative exemption defense at trial, as this Court has already recognized, the merits of the case are not at issue now.  Instead, at this stage of the litigation, Plaintiff has readily met her **lenient** burden for conditional certification and notice.

### C. Defendant Fails to Address On-Point Insurance Claims Examiner Cases and Instead Relies on Inapposite Caselaw

Courts in this Circuit[4] and across the country[5] routinely permit issuance of opt-in notice to

---

[4] *Canaday v. Anthem Cos., Inc.*, 439 F. Supp. 3d 1042, 1044 (W.D. Tenn. 2020) (granting nationwide notice to all medical management nurses whose primary job duty was to determine whether to approve insurance claims by applying "standardized guidelines, standardized criteria, and Anthem's policies and procedures"); *McClain v. First Acceptance Corp.*, 2017 WL 3268026, at *4 (M.D. Tenn. Aug. 1, 2017) (granting notice to all total loss claims adjusters who worked for employer in 350 retail locations in 12 states based on one declaration and one job description).

[5] *Allen v. Hartford Fire Ins. Co.*, 2017 WL 3701139 (M.D. Fla. Aug. 25, 2017) (granting notice to nationwide group of "Analysts" who processed disability insurance claims under 41 different job titles based on declarations stating they primarily processed disability claims, performed claims review work regardless of title, were paid a salary while regularly working over 40 hours a week without overtime pay, performed their work in accordance with strict policies and procedures, had no authority to negotiate claims, and had their work frequently reviewed by superiors); *Williams v. U.S. Bank Nat. Ass'n*, 290 F.R.D. 600, 610 (E.D. Cal. 2013) (granting notice to mortgage underwriters bound by defendant's underwriting guidelines and uniformly classified by defendant as exempt); *Hart v. U.S. Bank NA*, 2013 WL 5965637, at *4 (D. Ariz. Nov. 8, 2013) (granting notice to nationwide group of automobile underwriters and RV/marine underwriters based on showing that they had the same primary duty of making underwriting decisions by applying internal credit guidelines and worked over 40 hours per workweek); *McKeen-Chaplin v. Provident Sav. Bank, FSB*, 2013 WL 4056285, at *6 (E.D. Cal. Aug. 12, 2013) (granting Rule 23 class certification and FLSA conditional certification to mortgage underwriters who were bound by defendant's underlying guidelines and uniformly classified by defendant as exempt); *Clark v. Centene Corp.,* No. A-12-CA-174-SS, 2013 WL 12108138, at *4 (W.D. Tex. May 8, 2013) (granting notice to "Case Manager/Pre Certification," "Case Manager/Prior Authorization," and "nurses working in 'utilization management'" whose job duties included "applying pre-determined criteria and guidelines to a patient's medical data in response to requests by medical providers for authorization of services"); *Bollinger v. Residential Capital, LLC,* 761 F. Supp. 2d 1114, 1121 (W.D. Wash. 2011); *Gee v. Suntrust Mortg., Inc.,* 2011 WL 722111, at *3 (N.D. Cal. Feb. 18, 2011); *Wong v. HSBC Mortg. Corp. (USA)*, 2008 WL 753889, at *3–4 (N.D. Cal. Mar. 19, 2008) (granting notice to companywide group of loan officers classified as administratively exempt,

groups of workers who process insurance claims in accordance with predetermined guidelines and reject the arguments Defendant makes here. Moreover, Courts also routinely grant conditional certification to similar insurance processing employees where, as here, they make a showing that they all: (1) used guidelines in the same claims manual to process claims; and/or (2) lacked authority to deny disability claims for failing to meet approval criteria. *Weeks v. Matrix Absence Mgmt. Inc.*, 2020 WL 6081500, at *4 (D. Ariz. Oct. 15, 2020) (granting notice to all "Claims Examiners" employed in four different job titles to process disability and leave claims based on evidence that, regardless of title, the employees were "only allowed to deny claims without approval from a supervisor if the claimant failed to provide necessary documentation" and "could only approve or deny claims based on whether the claims met specific, predetermined criteria"); *Harper v. Gov't Employees Ins. Co.*, 2011 WL 10548148, at *2 (E.D.N.Y. June 14, 2011), *aff'd*, 826 F. Supp. 2d 454 (E.D.N.Y. 2011) (rejecting argument that differences in claims administered by telephone insurance adjusters precluded certification, and granting notice to nationwide group of GEICO employees). Defendant fails to address this mountain of case law—cited throughout Plaintiff's Motion—supporting conditional certification of the Benefits Specialists who processed claims in accordance with guidelines contained in Defendant's Claims Manual.

Instead of addressing the on-point case law, Defendant dedicates its response to highlighting irrelevant distinctions between the collective action members. The alleged variation between STD, LTD, and IDI Benefit Specialist positions alleged by Defendant, however, does not impact this

---

suggesting a "uniformly-applicable basis for defendants' classification decision"); *Neary v. Metro. Prop. & Cas. Ins. Co.*, 517 F. Supp. 2d 606, 609 (D. Conn. 2007) (granting notice to Field Adjusters, Field Appraisers and/or Outside Adjusters based on Plaintiff's testimony that "he and the putative collective action members are similarly situated in that they all held the same or similar position and had the same or similar responsibilities and daily tasks."); *Baldozier v. Am. Family Mut. Ins.*, 375 F.Supp.2d 1089, 1092–93 (D. Colo. 2005) (granting notice to nationwide group of vehicle damage claim representatives who were treated as exempt and denied overtime pay based on affidavits asserting that all representatives had same job function regardless of location or title).

Court's analysis at step one. *Jancich v. Stonegate Mortg. Co.*, 2014 WL 1011480, at *3 (D. Kan. Mar. 17, 2014) (rejecting argument that exemption defenses were highly individualized and finding that application of administrative exemption could be determined across the board); *Schroeder v. Humana Inc.*, 2012 WL 5931886, at *7 (E.D. Wis. Nov. 27, 2012) (rejecting argument that differences in job duties, different goals in applying guidelines before or after care is provided, locations worked, licensure requirements, management, production standards, workloads, and guidelines precluded conditional certification). Courts also reject Defendant's argument that potential differences in the amount of discretion exercised by employees precludes certification at the first stage[6]—and even later, at step two, *Hardesty v. Kroger Co.*, 2018 WL 4680801, at *6 (S.D. Ohio Sept. 28, 2018) (denying decertification in case where recruiters "provided inconsistent testimony pertaining to a key issue in the Administrative Exemption analysis: whether (and how much) discretion they exercised in performing their duties"). After discovery, if the differences between the Benefits Specialists prove so significant that their claims cannot be decided as a class, Defendant may ask the Court to decertify

---

[6] *Allen*, 2017 WL 3701139, at *1 (rejecting arguments that differences in job titles and "distinct levels of discretion and independent judgment of insurance analysts" employed under 41 job titles should preclude certification); *Clinton v. Gov't Employees Ins. Co.*, 2017 WL 3025558, at *3 (E.D. Va. July 14, 2017) (rejecting defendant's argument that Plaintiffs were not similarly situated "because each employee exercised varying levels of discretion and independent judgment and were subject to varying degrees of supervision," providing that "individual differences among Plaintiffs as to the exercise of discretion and the extent to which they were supervised are immaterial at this stage in the certification process"); *Lewis v. Epic Sys. Corp.,* 2016 WL 5947353, at *4 (W.D. Wis. Oct. 13, 2016) (collecting cases and rejecting argument that plaintiffs had different primary duties because they exercised different levels of discretion and independent judgment); *Green v. Harbor Freight Tools USA, Inc.,* 2010 WL 11435190, at *5 (D. Kan. Aug. 17, 2010) (rejecting argument that the "amount of discretion exercised in performing managerial responsibilities" due to differences in "volume of inventory in each store, the number of staff available and the manager's ability to delegate" made notice inappropriate); *Diller v. Sunoco Logs. Partners Ops., G.P., L.L.C.*, 2006 WL 8450765, at *4 (S.D. Tex. May 5, 2006) ("While determining the application of the administrative exemption may in some cases require a 'case by case' review of the employee's degree of discretion and independent judgment, as argued by Sunoco, in this case the potential need for individual assessment does not weigh against notification. At this juncture, plaintiffs need only make substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.").

the class, or the Court may divide the class into subclasses. *Schroeder,* 2012 WL 5931886, at *8; *see also Wilks v. Pep Boys*, 2006 WL 2821700, at *7 (M.D. Tenn. Sept. 26, 2006), *aff'd*, 278 F. App'x 488 (6th Cir. 2008) (collecting cases and noting that "factually disparate plaintiffs are often divided into subclasses for the purposes of judicial efficiency at trial").

Plaintiff, however, has gone further than many other cases where courts granted notice by providing unrebutted evidence that all Benefits Specialists lack the authority to deny claims for failing to meet predetermined criteria. Instead, Benefits Specialists must send all claims that do not meet criteria to a supervisor to determine whether to deny a claim for not meeting criteria. ECF 53, Siegel Decl., Exs. A-K, ¶ 7, 8; *id.* ¶ 8 (citing Ex. J, at 143:18-24 (former Unum Claims Director and Assistant Vice President admitting in deposition that Benefits Specialists could not make the decision to deny benefits without director approval)). Moreover, Plaintiff has alleged and provided evidence that all Benefits Specialists used guidelines from the same Claims Manual to process their disability claims. *See* ECF 1, ¶¶ 4-8; ECF 53, Siegel Decl., Exs. A-H, ¶¶ 4, 7-9; *id.*, Grp. Ex. K, at 23, 29, 48, 54, 64; *id.*, Ex. N, at 25-27.

### D. Defendant Fails to Address the Fact That ALL Benefits Specialists' Decisions Were Determined by Strict Guidelines and Policy Terms.

Although Defendant attempts to address the fact that Benefits Specialists do not meet the requirements of the second prong of the administrative exemption (performing work directly related to management or general business operations), it does not address that the third prong (the exercise of discretion and independent judgment) cannot be met because Benefits Specialists' decisions were dictated by the strict guidelines set forth in the Claims Manual. *See* ECF 52, at 20. Plaintiff provided ample evidence that **all** Benefits Specialists, regardless of title, were subject to the company's strict review criteria. ECF 53, Siegel Decl., Exs. A-H ¶ 8. As a result, Benefits Specialists are necessarily similarly situated with respect to the third prong of the exemption.

At one point, Defendant argues that "[e]ach area is also subject to different approval

guidelines," but the guidelines Defendant cites relate to which decisions need direct oversight, not to how decisions are made. ECF 84, at 4. Defendant argues that, if a Benefits Specialist can make a decision without receiving permission from a superior, the Benefits Specialist exercises discretion and independent judgment. *Id.* at 21. That is incorrect.

As established by Plaintiff's substantial evidence, Benefits Specialists' decisions were governed by strict guidelines. The fact that, after sufficient training and enough years at the Company, certain employees could be trusted to adhere to those guidelines—for a small subset of tasks—without direct oversight is not evidence of independent judgment. Just as cashier that "decides" to give a customer exact change or give a customer credit for a competitor's coupon in accordance with store policy is not exercising discretion simply because his manager is not looking over his shoulder, a Benefits Specialist is not exercising discretion just because she adheres to mandatory guidelines without additional oversight.[7]

Although Defendant makes vague references to "judgment calls," nowhere in its Response does it point to a decision that both: (1) requires discretion and independent judgment and (2) relates to a matter of significance to the Company. The only "judgment call" described in any detail seems not to require any judgment at all. In an attempt to show that certain judgment calls were more common in IDI review, one declarant states:

> For example, in one case, the insured was a surgeon who specialized in treating burns. While he could no longer perform burn surgeries, he could remain fully employed by performing other surgeries. Even so, **under the terms of his specific policy**, he was considered totally disabled. Judgment calls concerning these issues typically do not arise with the frequency or degree in other areas as they do in IDI.[8]

---

[7] Defendant's suggestion that more Benefits Specialists working from home due to COVID-19 is an indicator of their exempt status is equally absurd. ECF 84, at 2-3. Scores of data entry employees, envelope stuffers, and customer service representatives work from home in non-exempt positions. The location of the work has no bearing on whether the primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

[8] ECF 84-1, McCue Decl., ¶ 12 (emphasis added).

Although it is possible that this may have required "judgment," it is also possible that the policy said something like "disability benefits will be provided if the insured cannot perform surgeries in his specialty area—treating burn victims."

It is telling that Defendant seeks to have the Court deny Plaintiff's motion based on conclusory and unsupported evidence, which at best shows that there is a fact dispute as to the level of judgment Benefits Specialist exercise. Rather than demonstrating that Benefits Specialists use discretion and independent judgment in the course of their jobs, Defendant repeatedly emphasizes that, as soon as a decision involves any degree of complexity, it is outsourced to other individuals—even if that decision is something as simple as what documents need to be gathered for particular claims:

> In most cases though, the Benefits Specialist must determine what records and information to request in order to support the claim. They usually make the decision to work with clinical, vocational, or financial resources[9] to determine what needs to be gathered. They are also likely to decide to refer the claim to one or more forums, where the Benefits Specialist can discuss the claim and seek input from clinical and vocational resources as well as the manager.[10]

Rather than refuting Plaintiff's claims, these descriptions of Benefits Specialists' duties effectively mirror the declarations submitted by Plaintiff, which note that Benefits Specialists' primary duties included "sharing information and documents with supervisors/managers and other specialized staff, such as nurses and vocational experts, to receive guidance on how to process claims." ECF 53, Siegel Decl., Exs. A-H ¶ 6.

### E. Defendant Asks the Court to Make Improper Credibility Determinations.

Even though the Court made clear it does not make credibility determinations or resolve

---

[9] Defendants' declarants repeatedly use the term "resources" as a euphemism for "decisionmakers."

[10] ECF 84-1, McCue Decl., ¶ 13; *see also* ECF 84-2, Ayers Decl., ¶ 12 ("Specialists typically decide to consult with clinical and vocational resources when determining an expected duration and may also consider written durational guidelines."); *id.* ¶ 16 ("The Benefits Specialist will typically bring in a vocational resource or other resources to facilitate the return to work….").

factual disputes at this stage, Defendant attempts to discredit Plaintiff, the opt-in plaintiffs, and the other declarants by suggesting[11] that (1) Benefits Specialists at one level of seniority could not possibly know the job duties of their co-workers at another level of seniority; and (2) Benefits Specialists who primarily review one type of disability claim could not possibly know the job duties of those that handle a different type of disability claim. Even if such statements were not directly contradicted by Plaintiff's evidence,[12] rendering them irrelevant at this stage, they are contradicted by Defendant's own evidence.

Defendant's declarations make clear that, rather than being isolated from one another, Benefits Specialists at different seniority levels engage with each other and discuss their job duties on a regular basis. According to Defendant, not only did Benefits Specialists of varying seniority participate in "forums" together, ECF 84, at 7 (citing ECF 84-1, ¶¶ 16-17; ECF 84-2, ¶ 16), but trainees were mentored by longer-tenured Benefits Specialists for a full year, *id.* at 9. Moreover, Defendant's assertion that Plaintiff could not have had knowledge of the review process for non-STD claims is directly refuted by the performance evaluations Defendant attached to its Response. ECF 84-3, Swinney Decl., at 12-55. Rather than only learning about a single disability product, Benefits

---

[11] Rather than providing copies of review guidelines, claims manuals, or training materials, all of which are certainly in Defendant's possession, Defendant instead relies on declarations from company directors. Courts in this Circuit and around the country have noted that declarations from current employees "are routinely given little or no weight at the conditional certification stage." *Crosby v. Stage Stores, Inc.*, 348 F. Supp. 3d 742, 749 (M.D. Tenn. 2018) (citing *Myers v. Marietta Mem'l Hosp.*, 201 F. Supp. 3d 884, 891-92 (S.D. Ohio 2016); *Tinsley v. Covenant Care Servs., LLC*, 2016 WL 393577, at *9 (E.D. Mo. Feb. 2, 2016); *Avendano v. Averus, Inc.*, 2015 WL 1529354, at *7 (D. Colo. Mar 31, 2015)). As noted in *Myers*, affidavits "gathered by an employer from its current employees are of limited evidentiary value in the FLSA context because of the potential for coercion." *Myers*, 201 F. Supp. 3d at 891-92.

[12] ECF 53, Siegel Decl., Exs. A-H ¶ 14 (explaining that the declarants had knowledge of other Benefits Specialists' job duties through conversations they had with other Benefits Specialists, training calls and webinars they attended with other Benefits Specialists, training seminars they attended with other Benefits Specialists, and observations of other Benefits Specialists performing the same type of work while working similar hours).

Specialists were encouraged to "shadow" employees from different departments to learn more about the entire business. In her 2016 performance review, Plaintiff's manager notes: "In 2016, [Plaintiff] had completed several job shadows in different areas of the company." *Id.* at 40. Similarly, in 2018, her manager notes: "[Plaintiff] continues to pursue interest and participates in job shadows in other areas of the company" and that "her name has been given as a cross team participant in the future." *Id.* at 17. Thus, even Defendant's own evidence shows that Plaintiff and other Benefits Specialists had ample opportunity to learn about their coworkers' job duties.

Further, even though the "Milestone Reviews" documents—the only duties-related documents supplied by Defendant—provide no insight into the level of discretion or independent judgment used in the decision-making process, these documents underscore that nearly all "decisions" made by Benefits Specialists, regardless of department or level, must be reviewed by higher level employees. *Id.*, Ex. A; ECF 84-2, Ayers Decl., Ex. A.

### F. The Court Should Not be Misled by Defendant's Inappropriate and Unfounded Attacks on Plaintiff.

Trying to assert the dubious argument that Plaintiff is unique and **is not similarly situated to others with the same seniority who review identical claims**, Defendant repeatedly claims, without credible evidence, that Plaintiff suffered from performance issues and consistently failed to meet expectations. ECF 84, at 2-3, 10-11. Defendant argues that this particular Plaintiff happens to be unique based solely on speculation and conclusory allegations by a witness without firsthand or secondhand knowledge.

Defendant's argument rests entirely on the following speculative testimony:

> I do not believe that Ms. Loomis' employment experiences at Unum were similar to those of other Benefits Specialists in the STD area. Throughout her time at Unum, her manager identified many areas requiring improvement, including better managing her worklist and workflow, setting appropriate activities, promoting customer service and responsiveness, and improving her overall efficiency. Because of these concerns, she was **likely** to have been more closely supervised than other Benefits Specialists at her level, meaning she was not exercising the same discretion and independent

judgment of other Core Benefits Specialists in the STD area.

ECF 84-3, Swinney Decl., ¶ 14. (emphasis added).

By its own express terms, this testimony is rank speculation. First, Swinney speculates that Plaintiff was likely subject to greater supervision, adding that greater supervision means Plaintiff did not exercise the same discretion and independent judgment as other employees. But Swinney's conclusion about Plaintiff's level of discretion and independent judgment relative to other employees is based solely on the assumption that Plaintiff was more closely monitored.

Rather than faithfully relating that speculative opinion and its lack of foundation, Defendant affirmatively states multiple times that "Plaintiff was subject to closer supervision than other Benefits Specialists." ECF 84, at 3, 11. That is, Defendant improperly suggests that Swinney was testifying conclusively that Plaintiff exercised less discretion and independent judgment than other employees, even though that opinion was based on what she speculates was "likely." Even if the Court decides to weigh evidence, it should give this testimony no weight.

Although the quality of Plaintiff's performance is irrelevant to deciding whether she and other Benefits Specialists were exempt from overtime, Defendant mischaracterizes the performance evaluations. A fair reading of Plaintiff's performance evaluations demonstrates that she met Unum's expectations.[13] Indeed, she was routinely praised for the quality of her work, attitude, and work ethic.[14]

---

[13] Every annual evaluation that Defendant provided shows that Plaintiff met the Company's expectations. ECF 84-3, Swinney Decl., at 22, 32, 41, 52. Defendant has not provided a single review or rating showing that Plaintiff failed to meet expectations.

[14] Her reviews include the following statements: "Kerry Ann continues to utilize CCD and forums appropriately and is always willing to help her team mates out by bringing files to forum when they are on PTO," ECF 84-3, Swinney Decl., at 13; "Kerry has continued to keep focus on ensuring claimant satisfaction," *id.* at 14; "I rarely receive escalations off of Kerry's desk," *id.*; "Great job with your steady answering of calls!" *id.* at 17; "Kerry clearly documents her actions plans and her eligibility reviews are thorough," and she "does a great job obtaining detailed calls and obtaining important details related to claim," *id.* 17; "Continues to utilize resources and forums appropriately and is well prepared," *id.* at 18; "Kerry's QA results through June have been close to perfect," "overall QA Total

In short, the critiques were generally related to the speed and the efficiency of her work, not the quality of her work product. The alleged deficiencies cited by Defendant have nothing to do with decision-making, and there is no reason to believe Plaintiff's decisions were more closely supervised than the decisions of other Benefits Specialists. In fact, one comment from an evaluation specifically notes: "The majority of the manager file reviews on Kerry Ann's claims have agreed with Kerry Ann's decisions and next steps." ECF 84-3, Swinney Decl., at 32.

Defendant is correct that, throughout her time at the company, a consistent theme was the fact that the work given to her could not be completed in 8 hours. On one self-evaluation, Plaintiff included a goal of "working no more than 9 hrs/day." *Id.* at 18. As demonstrated by the declarations of other Benefits Specialists around the country, however, regularly working overtime was the norm and in no way distinguished Plaintiff from her colleagues.

## V.    Plaintiff's Modified Proposed Notice Should be Approved

Plaintiff has modified her proposed notice to identify better the specific job titles set forth in Defendant's Response and to define more accurately the collective.[15] The revised proposed notice is attached as Exhibit A.

Absent "reasonable objections . . . , plaintiffs should be allowed to use the language of their choice in drafting the notice." *King v. ITT Continental Baking Co.*, 1986 WL 2628, at *3 (N.D. Ill. Feb. 13, 1986). Nevertheless, Defendant asks the Court to require Plaintiff to add language regarding

---

is 99.8%," "the results in all sub categories are way above expectations," and "[e]xcellent work on this," *id.* at 24; "Kerry's Decision Times through June are within goals, averaging 77.9%," *id.*; "Kerry Ann has a positive attitude, displays a willingness to learn and accepts/incorporates feedback readily," *id.* at 32; "I have observed her telephone calls and she is professional, empathetic and sets clear expectations in her calls," and "I have not received escalated calls from any of her claims," *id.*; "Most importantly her quality maintained at a good level throughout the entire year, which was identified both with Performance Guarantee results as well as my review of files" *id.* at 41.

[15] These positions include the "STD Benefits Specialist," "LTD Benefits Specialist," and "IDI Benefit Specialist" positions at all levels (i.e., Core, Senior, and Lead) identified in Defendant's Response. *See* ECF 84, at 1, 4, 7.

the opt-in plaintiffs' discovery obligations and language informing opt-ins that they may be responsible for Defendant's costs.

Including language about possible discovery obligations suggests that putative class members may be requested to provide documents only if they join the case. This is misleading, because every putative class member is a percipient witness regarding relevant facts at issue in this case and may be asked to provide testimony or documents even if they do not opt in. Nevertheless, Plaintiff's revised notice at Exhibit A includes language that accurately reflects discovery obligations.

Any mention of costs serves no purpose other than to chill participation. Moreover, opt-in plaintiffs should not be liable for costs in FLSA actions. 29 U.S.C. § 216(b) (authorizing awards of costs for plaintiffs but not defendants). Counsel for Plaintiff is unaware of any case where an opt-in plaintiff has been taxed with Defendant's costs, and Defendant has provided none to support its request.

Indeed, such an imposition of costs is speculative at best, and courts regularly find that such language would chill participation in the collective action. *See, e.g.*, *Bath v. Red Vision Sys., Inc.*, 2014 WL 2436100, at *7 (D.N.J. May 29, 2014) (reasoning that including cost language "is unwarranted"); *Hart v. U.S. Bank NA*, 2013 WL 5965637, at *22 (D. Ariz. Nov. 8, 2013) (stating that cost language would "chill[] an interested plaintiff from seeking more information"); *Hardesty v. Litton's Mkt. & Rest., Inc.*, 2012 U.S. Dist. LEXIS 172294, at *7–8 (E.D. Tenn. Dec. 5, 2012) (rejecting defendant's request to add language stating that plaintiffs could be liable for costs); *Enriquez v. Cherry Hill Mkt. Corp.*, 2012 WL 440691, at *3 (E.D.N.Y. Feb. 10, 2012) (stating that language about opt-in plaintiffs having to pay costs "may unduly discourage potential plaintiffs from opting in"); *Austin v. CUNA Mut. Ins. Soc.*, 232 F.R.D. 601, 608 (W.D. Wis. 2006) (reasoning that costs language "would chill participation"). As such, adding language that opt-ins "may be liable for Defendant's costs" in no way assists plaintiffs in making an **informed** decision about whether to participate; it is simply intended to scare them away.

*See Sutton v. Diversity at Work Grp., Inc.*, 2020 WL 7364535, at *6 (S.D. Ohio Dec. 15, 2020) (agreeing with plaintiffs that their proposed notice should not include language regarding potential costs because to do so would "unfairly dissuade participation"); *Slaughter v. RMLS Hop Ohio, L.L.C.*, 2020 WL 1929383, at *10 (S.D. Ohio Apr. 21, 2020) (citing recent Sixth Circuit cases declining to include language related to costs in proposed notice).

Defendant also objects to Plaintiff's request to issue notice by text message and her request for a reminder notice. The Court should overrule these objections.

The news is rife with concerns over the ability of the United States Postal Service to handle increased volume considering equipment reductions and increases in volume due to COVID-19. For example, the USPS described it as an "extraordinary year of unprecedented challenges given the COVID-19 pandemic and a historic record of mail and package volume this holiday season." *Amid Historic Volumes in an Extraordinary Year for Deliveries, the U.S. Postal Service Reinforces Importance of Mailing Packages Early*, National News, www.USPS.com (Dec. 14, 2020).[16]

Email is a typical method of notice in FLSA collective actions. *See, e.g., Russell v. Grubb & Assocs.*, 2019 U.S. Dist. LEXIS 168896, at *26 (E.D. Tenn. Aug. 15, 2019) (stating that email notice is the current nationwide trend). It has the advantage of being low cost and perhaps more effective than mail. Still, the proliferation of spam means that email often only reach a fraction of putative class members, and the ones that do receive them are more likely to ignore it.

As courts regularly acknowledge, text messages are simply a more effective method of providing notice:

> The reality of modern-day life is that some people never open their first-class mail and others routinely ignore their emails. Most folks, however, check their text messages regularly (or constantly). Since I am convinced that text messaging will increase the

---

[16] Available at https://about.usps.com/newsroom/national-releases/2020/1214-usps-reinforces-importance-of-mailing-packages-early.htm.

likelihood that class members will learn about this lawsuit, I approve the use of text message notice in this case.

*Lawrence v. A-1 Cleaning & Septic Sys., LLC*, 2020 U.S. Dist. LEXIS 74685, at *12 (S.D. Tex. Apr. 28, 2020). "Indeed, given the amount of junk mail that people receive, email and text message likely are more effective methods for communicating with potential class members than traditional, first-class mail." *Landry v. Swire Oilfield Servs., LLC*, 252 F. Supp. 3d 1079, 1130 (D.N.M. 2017); *see also Thrower v. UniversalPegasus, Int'l Inc.*, -- F. Supp. 3d --, 2020 WL 5258521, at *12 (S.D. Texas Sept. 3, 2020); *Cattie v. Castlerock Hospitality Emps. LLC et al*, No. 3:20-cv-00237 (M.D. Tenn. May 13, 2020) (authorizing text notice); *Warren v. MBI Energy Servs., Inc.*, 2020 U.S. Dist. LEXIS 32383, at *28-30 (D. Colo. Feb. 24, 2020) (granting text message notice); *Bernardez v. Firstsource Sol. USA, LLC*, 2019 U.S. Dist. LEXIS 155918, at *26 (W.D. Ky. Sept. 11, 2019) (authorizing notice to all putative members of the FLSA collective via U.S. Mail, e-mail, and text message); *Irvine v. Destination Wild Dunes Mgmt.*, 132 F. Supp. 3d 707, 711 (D.S.C. 2015) (authorizing text notice as "eminently reasonable" in a more "mobile society" where texting is one of "the most consistent and reliable method[s] of communication").

More than common sense supports the decisions of these courts. Research demonstrates the superior efficacy of text message notice over email notice. As noted by the Federal Communications Commission, "consumers open a far larger percentage of wireless messages than email and open such messages much more quickly." *Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service*, WT Docket No. 08-7, Declaratory Ruling, FCC-CIRC1812-04, at 6 (Nov. 21, 2018). **Open and response rates for text messages are as high as 98% and 45%, respectively, compared to 20% and 6% for email.** *See* FCC-CIRC1812-04 at 6 n.40 (noting consumers open 98% of all SMS messages they receive but only open around 20% to 30% of emails). One reason for this is that text messages are far more trustworthy than emails. The FCC notes that "the spam rate for SMS is estimated at 2.8 percent whereas the spam rate for email is estimated at over 50 percent." *Id.* Although

lawyers and courts may continue to rely heavily on email for business communications, the experience of average consumers is that text messages are more likely to be serious communications. As such, a concise and neutral text message would apprise putative plaintiffs of this lawsuit better than an email.

The process for text notice is virtually identical to email notice and poses no substantial privacy concerns. *See Dennis v. Greatland Home Health Servs.*, 438 F. Supp. 3d 898, 902 (N.D. Ill. 2020) (granting notice via text message and noting that "any moderate intrusion caused by such a text message is outweighed by the interest in apprising all potential class members" of their right to opt-in to the collective action). The sole difference between text and email notice is that putative plaintiffs would receive a short text message with a link directing them to the full Notice and consent form instead of an email that has the Notice and Consent attached. Such a text message would include all salient information necessary to assure plaintiffs of its authenticity. For example:

> [Name],
>
> The U.S. District Court for the Eastern District of Tennessee authorized notice of a Fair Labor Standards Act lawsuit. The notice informs you of your potential eligibility to join the case. Plaintiffs seek to recover unpaid overtime wages for all current and former Unum Disability Benefit Specialists. Unum denies all liability. The link below will take you to the Court-approved Notice & Consent Form. To file a claim for overtime wages in this case, you must complete & submit the Consent Form. You may also receive this Notice & Consent Form via U.S. mail & e-mail. Please note that filing a Consent Form does not guarantee any amount of recovery.
>
> [Link]

Plaintiff would send this text message once to all putative plaintiffs on the notice list for whom Unum provides a phone number. This limited notice would accord with the broad, remedial purposes of the FLSA "to make as many potential plaintiffs as possible aware of this action and their right to opt in" while simultaneously avoiding "devolving into a fishing expedition or imposing undue burdens on the defendants." *Chhab v. Darden Rests., Inc.*, 2013 U.S. Dist. LEXIS 135926, at *46 (S.D.N.Y. Sept. 19, 2013).

Defendant's argument that telephone numbers are highly private and should not be provided

is belied by Rule 26(a)(1)(A)(i) of the Federal Rules of Civil Procedure, which requires parties to provide "the name and, if known, the address and telephone number of each individual likely to have discoverable information . . . ." Fed. R. Civ. P. 26(a)(1)(A)(i). Each of the putative class members will likely have discoverable information, and although Defendant may not intend to rely on them, the Rules expressly contemplate disclosure of witness phone numbers, and Plaintiff should receive them in discovery in this case. To alleviate any concerns about improper solicitation, however, Plaintiff's counsel will agree not to contact putative class members using the phone numbers provided by Defendant during the notice period. Any further restriction would unfairly limit Plaintiff's access to witnesses.

Finally, a reminder notice is common and not "unnecessary" as Defendant contends. A reminder notice is an important step in the notice process that is commonly taken to ensure that all potential class members receive judicial notice, read it, and make an informed decision on whether to join the case. *See, e.g., Gee v. Suntrust Mortg., Inc.*, 2011 WL 722111, *4 (N.D. Cal. Feb. 18, 2011) (ordering issuance of a reminder notice); *Harris v. Vector Mktg. Corp.*, 716 F. Supp. 2d 835, 847 (N.D. Cal. 2010) (ordering issuance of a reminder postcard); *Oliver*, 2008 WL 7483891, *4 (plaintiffs permitted to send subsequent mailings of the notice at their own expense). Based on the foregoing, the Court should approve the modified proposed notice attached as Exhibit A.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Step-One Notice.

Dated: February 4, 2021     Respectfully submitted,

           */s/ Travis M. Hedgpeth*
           Travis M. Hedgpeth (TX Bar No. 24074386)
           THE HEDGPETH LAW FIRM, PC
           3050 Post Oak Blvd., Suite 510
           Houston, Texas 77056
           Tel: (281) 572-0727

travis@hedgpethlaw.com

Molly A. Elkin (DC Bar No. 450295)
Hillary D. LeBeau (DC Bar No. 155337)
MCGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave., N.W., Suite 1000
Washington, DC  20005
Tel.: (202) 833-8855
Fax: (202) 452-1090
mae@mselaborlaw.com
hdl@mselaborlaw.com

Charles P. Yezbak, III (TN BPR #019865)
N. Chase Teeples (TN BPR #032400)
YEZBAK LAW OFFICES PLLC
2021 Richard Jones Road, Suite 310A
Nashville, TN 37215
Tel.: (615) 250-2000
Fax: (615) 250-2020
yezbak@yezbaklaw.com
teeples@yezbaklaw.com

Jack Siegel (TX Bar No. 24070621)
Stacy W. Thomsen (CA Bar No. 274282)
SIEGEL LAW GROUP PLLC
4925 Greenville Avenue, Suite 600
Dallas, Texas 75206
Tel: (214) 790-4454
stacy@siegellawgroup.biz
jack@siegellawgroup.biz

*Attorneys for Plaintiffs and
Others Similarly Situated*

## CERTIFICATE OF SERVICE

I hereby certify that I filed this document on February 4, 2021, and that notice of this filing will be distributed to all counsel of record through the District's ECF system.

*/s/ Travis M. Hedgpeth*
Travis M. Hedgpeth